We have one case for argument this morning, or actually this afternoon, on one of these. United States v. Kriesel. You may proceed, and you can tell us how it's pronounced as well. Good afternoon, Your Honor. A call and comment for Mr. Kriesel. I'd like to say two minutes for rebuttal, if I may. I'd like first to briefly address the Administrative Procedure Act argument. This court has always construed the APA strictly when it comes to finding whether an agency has followed the rulemaking procedures that the law requires. In Bauschman, the court emphasized that these rules are not a mere technicality. The court stated that we believe that the notice rules serve an important interest, the right of people to present their views to the government, agencies which increasingly permeate our lives. In this case, dealing with DNA, which provides some of the most intimate information possible about a person, that notice and comment period, that rulemaking function, may have been more critical than even most cases this Court has seen previously. And the APA itself says quite clearly that the Court must invalidate a regulation that was made without observance of the procedures required. That's 5 United States Code 706-2d. Counsel, why is this not an interpretive rule? For a couple of reasons, Your Honor. The government would have liked Congress to have simply stated that all felonies qualify. But the statute clearly says that it's any felony as designated by the Attorney General. That is classic delegation of authority, and I do believe Congress anticipated that the AG would take advantage of the rulemaking process to determine which offenses beyond the violent offenses that were mandated originally are appropriate for inclusion in this program. Now, the government misconstrues the issue to some extent by saying that it is an interpretive rule and directs the Court's attention to the definition of felony. That portion of the statute of rule is not at issue. Defining what a felony is, the AG can do that because there are definitions out there in the United States Code, the common law, that Congress is not required to define every single term. But when it specifically says that the AG can designate some felonies, one felony and not another, or all felonies, that is a classic delegation of authority that requires the APA procedures to be followed. If this regulation had not been adopted, if they had delayed it for the notice and comment period, there would have been a time when the existing regulation was inconsistent with the text of the statute, which is what Congress intended. A practical answer to this? No, Your Honor. In fact, I believe that argument raised by the government is red herring, because the previous statute and the previous regulation would have continued in effect unless and until the Attorney General exercised a delegation of authority to expand the qualifying offenses. There was a statement in the statute. It would have been in conflict with the reading of the statute? No, because the statute only says any felony, which the AG may have decided was still only limited to crimes of violence as originally determined, or after a rulemaking process expanded it to include other felonies. While the AG was making that determination and following the APA, the previous regulations and the statute, which covers crimes of violence as well as any other felonies, would have continued in effect. So that argument that the government has raised has created conflict is simply not there, because the AG, even under the new statute, the 2004 amendments, could have come back and said we are simply not expanding the definition at this point. We are exercising a discretion to say only crimes of violence continue to qualify because we don't see the need to exercise the authority to include any other felonies. Counsel, if we go to the legislative history, what do we find there? What we find, Your Honor, is what I have indicated here, is that the government that the Congress did not draft the statute to include all felonies. What they wanted to do was expand the DNA database to those offenses that where there was a high rate of recidivism, and this actually spills over to my next argument, or there was going to be a particular use that DNA evidence could have in solving the type of offenses at issue. For example, DNA typically is only useful and only used in 97, 98 percent of the cases where there is DNA in evidence that are rape cases and homicides. So I think what Congress was contemplating that there would be a determination of where this was appropriate and useful, how the resources would be allocated, and also a weighing of the very considerable privacy interests that are, of course, implicated by expanding this to every possible offense that any felony, as designated by the AG, by the statute, allows. Let me, just speaking for myself, I am most interested in the second issue, and that is the constitutional challenge that you make. Thank you, Your Honor. In Kincaid, the Court expressly stated that it did not rule on a less narrowly tailored statute or one that, and this is from the state you may have included from the decision, included, quote, nonviolent drug offenders, and that's what the Court has presented with. Now, I'm going to focus on the totality test, because that's the one that the plurality adopted. And there are three critical differences that alter the balance of interests very much in this case. One, of course, is the 2004 amendments, which expanded to nonviolent offenders. That was not the case in Kincaid. We are dealing with somebody who is, by the government's own statistics, and this is not disputed, is in the lowest category of potential recidivists among all Federal offenders. The recidivism rate for Federal offenders overall is only 6.3 percent. We need to compare that, for example, in the situation in the Sampson opinion where the parolees had an approximately 70 percent recidivism rate. So the interests in terms of the government are radically different in this case from both Kincaid and the Supreme Court's recent authority. Well, I don't think you should be making a comparison. Parolees are essentially the same as those on supervised release. I think that's got to be true. No, Your Honor. I would disagree with that for two reasons. First of all, in Sampson, the Supreme Court stated that they were essentially the functional equivalent of inmates because they opted to be released from incarceration early pursuant to a written agreement with the State that they would agree, submit, to any and all searches regardless of whether there was suspicion. So they made an opt-out decision not to serve part of their sentence in jail. With supervised release, that is something that follows your period of incarceration and has a substantial return to your civil liberties. And I believe that is borne out by the statutory scheme. If you look at 18 United States Code 229, which deals with post-sentence administration, that's how it's captioned, probation and supervised release are expressly treated together. And it's also true in 18 U.S.C. 3593, which says supervised release conditions must be, quote, no greater than necessary to achieve the purposes of supervision and rehabilitation. That's not the case with inmates and parolees. And that's why I believe Sampson strongly supports the argument that when you're dealing with somebody with a very limited privacy interest, it is a radically different situation than when you're dealing with somebody on supervised release. There are a couple other critical distinctions, and I think Sampson is important here because I believe it supports my position. There, a suspicionless search was allowed because you had a parolee, the functional equivalent of an inmate, on active supervision. There is no suggestion by the government that DNA collection from Mr. Creasle plays any supervisory role. It's not in the legislation. It's not in the CODIS statement of purpose. And it was not argued by the government below. Part of the problem for the government is that they made no showing below of a compelling interest, whether it be based on a recidivism rate or any supervisory need. Those arguments help us distinguish Kincaid as a binding precedent? They do, Your Honor, because, first of all, what Kincaid was looking at was a violent offender, and there was ñ it is a much ñ You never mentioned the word violence in the decision. It's not based on that characteristic. Well, it's based on the 2000 statute, which was limited to violent offender, and also it was dealing with an armed bank robber. And it's a supervised release case, correct? It is also a supervised release case. But when you're dealing with what the ñ what the Kincaid plurality definitely said is that they were concerned with recidivism and deterrence. Now, those are easy to invoke, but when you're dealing with violent offenders, there's a much more substantial weight on the part of the government in terms of recidivism interest. It's also true in Sampson, where they expressly said in the majority of the opinion that there was a 70 percent recidivism rate. We are dealing now with a nonviolent offender who has the lowest recidivism rate, and it's a radically different alternative balance. Is it lower because he's a drug offender or is it lower because he's not violent? Well, there's two different things. It's lower because of the status of the offender that he is, as a nonviolent drug offender, who the government's own recidivism statistics that we supplied in the brief show have the lowest overall recidivism rate. And it's also as applied to Mr. Creasle as a nonviolent first offender who has all but successfully completed supervised release but for his objection to DNA. In fact, he would have been off supervision last February. That do you find anything in the Kinkade decision itself that you can point to to say this is not? Well, Your Honor, I would direct the Court to 379 F. 9, where the Court very carefully, the plurality, which was only five justices, very clearly said that they were not deciding less narrowly tailored legislation and that's what we have. This is the less narrowly tailored legislation with the nonviolent offender. This is exactly the case that Kinkade anticipated because we have here now a situation where the government is asking the Court to essentially find no privacy interest, allow a suspicionless search for anybody who is on post-sense administration. If you would get right down to it. I have my red light on, Your Honor. I'm sorry. What we have to decide is whether, however you define the privacy interest, how that stacks up in the totality of circumstances, whether balancing or totality with the stated government interest. And if there's no supervisory interest here, and we'll hear from the government, but it is basically a crime detection interest, then we just have to figure out if that's enough, correct? Correct, Your Honor. There's always two sides to the scale. I was arguing one side in terms of Mr. Creasle having an enhanced supervisory interest because of the status of his type of offense. But here we also have a situation where the government has made no showing, and they need to stand on their record. It's their burden to show that they have a compelling interest. They made no showing and no compelling interest. Is it a compelling interest? I mean, that's my other question. Well, it has to outweigh, it has to outweigh Mr. Can we just? I'm going to give you a little extra time so you can slow down slightly. I know. I appreciate it. Your words are going faster than my brain. So I just want to make sure that I have the standard correctly in mind because there's different words used in different cases. The one I pulled out was whether there's a legitimate government interest. Is that the correct standard? Your Honor, at a minimum, it has to be a legitimate government interest that outweighs the individual's privacy rights. I believe it has to, I've seen compelling and substantial. Now, in terms of what CODIS does, it is a law enforcement database for future investigations. I don't believe there's any real argument about that. That is what law enforcement is every day. I mean, everything that law enforcement does is try to solve crimes. So there's nothing particularly compelling about that. Now, what we have is an effective crime-fighting measure, as many other things are. But the fact it's effective doesn't make it constitutional. We have to weigh that not only against Mr. Creasle's privacy interests, given his what I call the continuum analysis from Samson, but we also need to look at the nature of the intrusion. Okay. Well, let me ask you about that. I mean, I know I wouldn't by any means suggest this is like a fingerprint in terms of intrusion. It's a different kind of intrusion. But why do you get to take fingerprints legitimately? Because what the government could do, I think if they were just taking the blood, just taking blood, it would be like a fingerprint. Why do you take fingerprints? That's my question. We take fingerprints because it's identifying information that's readily accessible, that's left, even as I'm speaking at the podium, on the podium, and does not reveal the type of information that a DNA test does. The reason that you take it is not because it doesn't reveal information that's like DNA. But one of the reasons you take it is so that you can have a database for purposes of identifying people who've been put into the criminal justice system. Sure. Benchmarking that against other data, correct? But I'd like to direct the Court to Skinner v. National Railroad Board, which is 289 U.S. at 616, because they addressed this very point. What they said was the initial blood draw, or the fact that you can make an identification, is not the real issue, because there's a second level of intrusion. The second level of intrusion is the further analysis, I'm quoting here from Skinner, further chemical analysis of the sample to obtain physiological data is further invasion of privacy interest. And what the Court was concerned about in Skinner, which was a special needs case involving safety issues with the railroad, was the fact that, yes, there was a substantial or compelling interest in safety, but that had to be balanced against the fact that what they were doing was taking a second level of intrusion in terms of analyzing the blood sample that trenched on possibly the most sensitive privacy information that any individual has. It reveals medical information, genetic information. It's now being expanded by the government to genetic surveillance of family members, as cited in my brief. They're using close matches that don't match up with an offender to now use them as a basis for requesting probable cause to get genetic tests from family members, because there's a correlation that if it's within a range of similarity, it may be a family member committed an offense. We had a whole argument in Kincaid that what they were looking at was junk DNA that didn't reveal genetic information. The science has already overtaken that. So the court, the Supreme Court, has always looked at not the act of taking the fingerprint or the blood or the mere identification, I'm speaking of the Supreme Court, as the critical privacy interest at stake, but everything else that the government, maintaining this information in perpetuity long after Mr. Creasle has been rehabilitated, finished his supervisory lease, and returned, supposedly as a full-fledged member of society, to delve into the most intimate aspects of our personality, medical history, and genetics. Unless there's additional questions now, I'd like to hear from the government. Thank you very much, Your Honor. I appreciate the additional time. May it please the Court, counsel. My name is Helen Bruner. I'm here representing the United States. Let me first address the final point that Mr. Fineman mentioned. Do you want to move the mic down just a little? Certainly. Thank you. It is a very tall podium. And that is the DNA samples itself. I want to address it only because I don't want there to be misunderstanding. I think the way this program has been set up is an effort to avoid using those strands of DNA, and by no means am I an expert in this. But as I understand it, and I think it was well documented in the Kincaid opinion, it's non-genic stretches of DNA that were chosen just precisely because they did not include trait coding and medical information. That indicates that science has moved on, maybe not quite the way it was thought to be. Well, that may well be, Your Honor, but my point is simply that the effort here was made early on as this program was set up to attempt to find that area where you could identify a person, deal with the identity of the person without necessarily getting into all of the medical privacy data issues that may arise. Could it be later used for those other purposes? Your Honor, if the question is whether science might move in that direction, certainly that's a possibility. The law as it currently stands, however, prohibits any such use. It allows in Title 42, 14132, sets out the reasons why this data can be used. It can be used for criminal justice agencies for law enforcement identification purposes. It can be used in judicial proceedings to the extent allowed by statutes and rules. It can be used for criminal defense where a defendant is allowed access to samples and analysis on the case with which. On state authorities? On state authorities. They have access to this database, don't they? They certainly do. And they're, as I understand it, they are bound, and there are criminal penalties for the failure to comply with this. What about, is it, I mean, you have DNA samples taken both by saliva and by blood, but what we're talking here is blood samples, is that correct? That is my understanding, Your Honor, that that was the chosen methodology because there, if I understand this correctly, and, again, I'm by no means an expert in DNA analysis, but that the blood testing provides better analysis as opposed to taking it from saliva. Certainly from saliva it has been used in cases. We've had cases where the bloats have been analyzed. There is more intrusion than fingerprints or saliva DNA, correct? Absolutely, Your Honor. Counsel, I'm not kidding. Can we just let her finish? Why isn't that a significant privacy intrusion? I do think it is an intrusion, Your Honor, but I think the Court has long since said that it is not that significant an intrusion. That precisely was addressed in Kincaid. That was really what I was going to ask her about. The dissent clearly thinks it's a substantial intrusion, and Judge Gould, who made up the majority, thought that it was a substantial intrusion. So aren't we bound by that? Well, I think you are with respect to blood, but I do think you are also bound by Kincaid with respect to the ultimate issue. With due respect to my opposing counsel, I think there really is not much of a difference between Mr. Creasle and the other defendants. The only difference here between Kincaid and this case is that the statute has now been amended so that instead of a smaller list of offenses that in fact include misdemeanors, that statute now reads any felony. And I can address the APA issue in a minute. Congress has gone even farther, and they say anybody arrested. They have, but it also includes, the statute also includes language within it, and unfortunately I did not write down the citation, which says that if a person from whom DNA is collected on the basis of an arrest, if that person is later acquitted of the conduct, that that record is then expunged. That's the new amendment, the arrest part? Yes. Does it matter here that there's a notice issue? Because Samson made some point about the intent being clearly expressed in terms of taking the DNA samples, whereas Mr. Creasle claims, of course, the timing of when he found out about this was pretty much of a pop surprise. Well, Your Honor, in that regard, I would – I think there is no notice claim here, but in any event, Mr. Creasle was told about the change. Mr. Creasle was given notice. He was given an opportunity to challenge that, and that is, of course, why we are here. So I don't think we have a notice issue in that regard. So what is the government's interest in it? Could you articulate that with respect to expanding it beyond violent crimes to any felony? If you look at it for any felony, particularly drug and other non-violent, non-sex abuse-related crimes, what's the government's legitimate interest? I think the interests remain the same as were articulated with respect to Kincaid. And if I might, I hope that I'm getting to your question by going to the recidivism rates that counsel quoted. The study is, of course, I believe that was submitted as part of the supplemental excerpts of record, and it's a study that was done regarding offenders that were prosecuted and sentenced in 1992. While it does show the 6.3% figure is a figure that looks only at those people who were further prosecuted. Now, there are a number of times when an individual may violate the law. They may in fact be, there may be a possibility of a future prosecution, but that we pursue it as a supervised release violation. And so if you look at the statistics with respect to all of the possible outcomes, which is what the Sentencing Commission did, the figures are even higher. And this study is a study that was done of criminal history. And if you look at Mr. Creasle's criminal history, Mr. Creasle is not a first-time offender. He has three prior drug-related offenses before this drug-related offense. That assumes that there's a logical connection. The premise is that this program serves to deter offenders who have already been convicted. But that would mean that there's a logical connection between having your DNA extracted and committing a nonviolent offense such as bank fraud, for example. How does DNA come into play in deterring somebody from committing bank fraud? Well, Your Honor, I actually do have an answer to that. We've had at least two cases within the office where fraud-related cases have been solved as a result of the saliva on an envelope. So there is certainly some relationship to broader areas than just murder, rape cases, things that would go to violent offenders. But in terms of the recidivism rates, my point was simply if you look at the, I believe it's Figure 11 within that study, for a person of Mr. Creasle's background in criminal history Category 4 and a drug offense, his recidivism rate is actually closer to 40%. There's distinctions between males and females that are made. So, you know, I guess we can talk about these figures any way we want, but I do think that there is still connection between DNA and deterrence whether or not you're talking about a violent offender. Is there any supervisory interest here that goes through some of these cases? Well, I think that there, if you're talking about Mr. Creasle directly, I don't know. I don't really think I'm talking about him. I'm talking about the Act expanding to these various crimes. I think for the same reasons that there has been supervisory interest and supervisory basis for asking for this DNA as set forth in Kincaid, that continues whether or not you're talking about a smaller universe of people versus a larger universe of people. What we're looking at, I suppose, is a balancing of what has been termed a substantial privacy interest against the government's interest. And certainly the government's interest is somewhat less for this category of felons than for those in the violent category. Would you agree with that? I don't believe so, Your Honor, actually, because I think there's a desire for deterrence whether or not you're categorizing something as a violent felony. I think the connection is more easily seen between DNA and a thought that if this person is a violent felon and let's say a sex offender is probably the easiest example, a sex offender who commits a crime, if we have his DNA, maybe he will be deterred from committing future crimes. I mean, that's a very direct link that you can see as opposed to something like licking the envelope, which may be not as direct. But I think in any event, the interests of the government remain the same regardless. I think that the fact that there was a desire and a need to try to expand this to look at all felonies. Well, it seems in large part that it really does boil down to a crime-fighting tool in terms of not really recidivism, per se, but just having more data so that when you have people arrested, things can be run through the database. I mean, doesn't all this sort of end up in the same place, even though people try to put it in three or four categories? Well, I certainly would not suggest that it does not have a crime-fighting function. That would be wrong. It certainly has been used to solve old cases, potentially could solve new cases. I do think, though, it continues to have a deterrent effect, or at least we hope it does. I suppose time will bear that out, time and statisticians. But it certainly, the reasons for it don't change just because the category of offenses that are covered were expanded. And I guess that was the point that I was trying to make about why Kincaid really, this isn't really different, because the interests of the government are still the same, the privacy interests of the defendant are still the same. There's just a greater number of people who might be covered. And actually, the irony here is I suppose Mr. Kincaid's case will be a rather small number of people who are affected, because there are only a limited number of people who will be on supervised release who have not already had DNA extraction while they're incarcerated. Counsel, would you tell me what your view is as to where supervised release fits in with parole and probation and incarceration? Your Honor, again, I have to respectfully disagree with Mr. Fineman. I do think that there is a very distinct parallel between parole and supervised release. Supervised release was created, in effect, to eliminate parole in the Federal system. But that was my thought, and I just, so I was curious at his answer. It certainly, it's part of punishment. It is in addition to incarceration. So there's a period of incarceration followed by a term of supervised release. And, in fact, in some ways, I suppose it could potentially cause even greater sentences than on parole, since an individual on supervised release could potentially serve longer than the maximum term under the statute. Because of the way the statutes are written, there is that possibility. I want to make sure I understand the processing of individuals time-wise. What you're saying is because of the timing of when Mr. Preissl and the statute arrived on the scene, that most people would have had their DNA extracted while they were incarcerated? Well, the same, yes, the same rules apply whether or not you are a person in custody or you're a person on supervised release. So what we're saying is that most people coming through the system as they would felons would have been incarcerated, it would have been taken there, and it wouldn't be taken for the first time on supervised release. Okay. If there's no further questions, thank you. Thank you, Your Honor, and thank you for allowing me to go. Yes. Everyone's had a little leeway today. You may have one minute for rebuttal. I guess the point I want to make is that, and I don't mean to invoke a prayer to horrors, but if everybody's DNA was in a database, we'd have the most effective of all law enforcement techniques. So the court really is in a line-drawing process, and that's what the totality test is about. I think what Kincaid, particularly in combination with Sampson, which was decided after Kincaid, tells us is this, is that violent inmates or serious offenders where the DNA may have a demonstrative relationship to solving the type of crimes they're involved with is a legitimate and government interest that outweighs any privacy interest. In addition from Sampson, what I think we garner is that you also had a component there of the person was on active supervision. It was a parole search while the person was on parole for purposes of supervision to see if they had any drugs. We have no supervisory element here. This is for a future law enforcement purpose, and the government had the opportunity below, at the hearings, to demonstrate some correlation between deterrence and this type of offender, between deterrence and the type of crimes that might be solved, and they did not take that opportunity. So when the government now is before the court offering anecdotal or speculative connections about deterrence, I respectfully submit that when we're doing this kind of balancing of constitutional interests with such core privacy interests at stake, the burden really is on the government to have proved this up. And my reading of the cases is correct. Every circuit that has addressed this has upheld the constitutionality of these new revisions. Is that correct? There's not one that has? No, Your Honor. All but one case has only addressed the prior act of violent offenders. The Sixth Circuit in Connolly upheld it, and they frankly said special needs are to tally. Circumstances, some very cursory analysis, it doesn't matter. There are two district court cases I submit supplemental authority on Friday, which have come out with a very detailed analysis that tracks us. So I think this is very much a live and open issue, and the only court is the Sixth Circuit. What about the Seventh Circuit? The Seventh Circuit dealt with a violent offender who would have – somebody who was an armed bank robbery defendant who would have qualified under the old statute, I believe. So I guess that's really my point. I think there was the Sixth, the Seventh, the Second. But you're saying you felt that they dealt with it in the context of a specific offender? Well, let me say that. The only case that has dealt with a nonviolent offender in light – since the amendments or at any time, actually, I believe, is the Connolly case. And I think that was addressed in my reply brief. And that's only the Sixth Circuit. The district courts seem to be going the other way. I think particularly with Sampson having to decide and emphasizing the supervisory aspects, that this court is now in a position to take that authority and, I hope, decide differently from the Sixth Circuit. Thank you. Thank you very much. The case just argued of United States v. Chrysler is submitted. Thank both counsel for your arguments this afternoon.
judges: B. Fletcher, McKeown, Schwarzer